

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-19-1999

# Assaf v. Fields

Precedential or Non-Precedential:

Docket 98-7153

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Assaf v. Fields" (1999). *1999 Decisions.* Paper 137.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/137

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-7153

EUGENE F. ASSAF,
        Appellant

v.

GEORGE C. FIELDS; GARY E. CROWELL

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 97-cv-00343)
District Judge: Hon. William W. Caldwell

Argued: December 14, 1998

Before: SLOVITER and COWEN, Circuit Judges,
and OBERDORFER,* District Judge

(Filed May 19, 1999)

Lawrence S. Markowitz (Argued)
Markowitz & Krevsky
York, PA 17405

 Attorney for Appellant

_____

*Hon. Louis F. Oberdorfer, United States District Judge for the District
of Columbia, sitting by designation.

        D. Michael Fisher
         Attorney General
        R. Douglas Sherman
        Calvin R. Koons (Argued)
         Senior Deputy Attorneys General
        John G. Knorr, III
         Chief Deputy Attorney General
         Appellate Section
        Office of Attorney General
         of Pennsylvania
        Harrisburg, PA 17120

         Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

Plaintiff Eugene F. Assaf brought this civil rights action against the Pennsylvania state officials responsible for his dismissal from public employment. Assaf's complaint, invoking 42 U.S.C. S 1983, charges that appellees George C. Fields and Gary E. Crowell terminated his employment for political reasons, thereby violating the First Amendment protections for belief and association. The District Court, in ruling on the defendants' motion for summary judgment, concluded that Assaf 's job was not one for which party affiliation is an appropriate requirement but nonetheless entered summary judgment for defendants on the basis of qualified immunity. Assaf v. Fields, 999 F. Supp. 622, 630–33 (M.D.Pa. 1998). Assaf filed a timely appeal. Our review of the grant of summary judgment is plenary. See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).

II.

The record, reviewed in a light favorable to Assaf, reveals the following: Assaf was hired in October 1988 as Director

2

of the Bureau of Vehicle Management for the Commonwealth of Pennsylvania. Assaf, a registered Democrat, was hired by then-Secretary of General Services David Jannetta, who was also a registered Democrat. At the time Assaf was hired, Robert Casey, also a Democrat, was Governor of Pennsylvania.

The Bureau of Vehicle Management is an agency within the Department of General Services. Assaf reported to the Deputy Secretary for Procurement, appellee George Fields. Fields in turn reported to the Director of the Department of General Services, appellee Gary Crowell. Crowell's position was a cabinet-level one.

Assaf was advised in writing of his employment as a Fleet Maintenance Manager (also referred to as Director of the Bureau of Vehicle Management) and that his position was under the Senior Management Service, a category of Commonwealth positions "in the unclassified service which have broad policy participation and management responsibility." As such, he was exempt from unemployment compensation coverage but covered by the Management Benefits Program. He was further advised that in that position he "serve[s] at the pleasure of the agency head."

Assaf 's job description listed as "Major Duties" of the position: "Directs the Bureau of Vehicle Management to meet the transportation needs of all requesting Commonwealth Departments, Agencies, and Commissions while remaining within the financial guidelines of self-generated income." The job description enumerated ten specific duties:

> 1. Participates with the Deputy Secretary in planning, developing and implementing appropriate standards, procedures and policies for obtaining and maintaining the Commonwealth Automotive Fleet.

> 2. Stays abreast of the automobile market and recommends when to purchase vehicles based on current sales volume, amount of income received,fixed and semi-fixed expenses, variable expense, andfixed overhead expense.

3

3. Determines the best type of vehicles to purchase.
. . .

4. Directs the operation of the Commonwealth Garage concerned with the service and repair of the automotive fleet. Negotiates and administers regular maintenance contracts with service Agencies and with dealerships for repair and preventative maintenance.

5. Directs the maintenance of all records and reports concerning the Commonwealth Fleet. . . .

6. Oversees the disposition of the Commonwealth owned vehicles. These vehicles are sold through an oral auction which is open to the public. Makes sure that all activities are carried out according to approved policy. Interacts with the general public whenever concerns arise.

7. Directs the payments of repair invoices from various vendors. . . .

8. Oversees the repair of vehicles at the Commonwealth Garage. . . .

9. Directs the temporary vehicle fleet making it available for use by the requesting Commonwealth Agencies to meet their temporary transportation needs. . . .

10. Works closely with the various Bureau Chiefs and supervisory personnel to maintain an efficient, logical and financially sound operation.

Assaf supervised the three divisions that made up the Bureau: the Administrative Division, the Vehicle Operations Division, and the Vehicle Maintenance Division. He directly supervised the three employees who headed these divisions. The Bureau as a whole employed a total of thirty-three to forty-six employees over whom Assaf exercised indirect supervision. His starting salary was $37,000 and at the time he was terminated his salary had risen to $52,000.

From the written description, it might have appeared that Assaf 's title as Director signified a public official with significant authority. Admittedly, the Director ran the day-to-day operation of the Bureau, which entailed overseeing a

4

fleet of approximately 8,000 vehicles. However, Assaf testified to the substantial limits of his authority. For example, the Director did not have the ultimate authority to hire employees within the Bureau. See Assaf at 50.[1] There is evidence that he also did not have the authority to fire Bureau employees. See James W. Martin at 31; Gregory Green at 8-9. Rather, such authority rested ultimately with the Deputy Secretary for Procurement, a position held by Fields. See Green at 9. At most, Assaf could formally reprimand employees who were under his indirect supervision, which he did on a number of occasions. See Assaf at 57-60.

Assaf testified that he had no authority over the Bureau's budget or purchasing decisions and did not negotiate maintenance contracts with outside vendors. See Assaf at 39, 41, 44. Although Assaf assigned vehicles to the various agencies, Fields had to approve each such decision and Fields retained control over executive vehicle assignments. See Fields at 65-66. Maintenance of the Commonwealth vehicles was performed at the Commonwealth Garage, and although Assaf could approve outside repair shops if they accepted the standard contract from the Commonwealth, the rates for payment were set according to a predetermined formula. See Assaf at 43-44; Fields at 61.

Similarly, although Assaf was listed as having responsibility for auctions, in fact the vehicle auctions were conducted pursuant to a formula used to select the vehicles, and vehicles could not be auctioned unless Fields approved the lists. The target prices for the vehicles at auction were also set by a formula, see Fields at 62-63, and the formula preceded Assaf's tenure, see Assaf at 60.

On January 21, 1995, Thomas Ridge, a Republican, was sworn in as Governor of the Commonwealth of Pennsylvania. Shortly after Governor Ridge's inauguration, Jannetta resigned as Secretary of General Services and Governor Ridge appointed Gary Crowell, a Republican, in

_____

1. Throughout this opinion all citations to deposition testimony will be referenced by the name of the deponent followed by the page number of the transcript.

5

his stead. Governor Ridge reappointed Fields as Deputy Secretary for Procurement.

On March 29, 1995, Fields notified Assaf by letter that his services were no longer needed. Fields at 44. The termination decision was made by Secretary Crowell. Crowell at 22-23. According to Assaf, Fields informed him that his termination was for political reasons. See Assaf at 76-77. Fields denies discussing with Assaf whether politics were involved. See Fields at 44.

Assaf applied for unemployment compensation pursuant to the Pennsylvania Unemployment Compensation Law. His application was ultimately denied by the Pennsylvania Unemployment Board of Review, which ruled that Assaf was not entitled to benefits because his was "a major non-tenured policymaking" position and therefore specifically exempted from the unemployment compensation scheme.

On March 5, 1997, Assaf filed this lawsuit in the District Court for the Middle District of Pennsylvania, charging that Fields and Crowell violated the First Amendment by terminating his employment for political reasons. Fields and Crowell moved for summary judgment. Without conceding that Assaf had in fact been fired for political reasons, they urged that Assaf's job was, in any event, not one for which the First Amendment provides protection. In the alternative, they argued that even if Assaf 's position was constitutionally protected they were nonetheless entitled to qualified immunity because the unlawfulness of the dismissal would not have been apparent to reasonable officials under clearly established law.

In ruling on the defendants' motion, the District Court first rejected the defendants' argument that Assaf had received the position through political patronage and could not now complain that he lost the position for a similar reason. See Assaf, 999 F. Supp. at 628 (citing Branti v. Finkel, 445 U.S. 507, 512 n.6 (1980) (rejecting argument that "because the [employees] knew the system was a patronage system when they were hired, they did not have a reasonable expectation of being rejected when control of the office shifted to [another party].")). The court next rejected defendants' argument that political affiliation was

6

a qualification for the job. The court noted that"the overarching factor is whether the worker has `meaningful input into decision making concerning the nature and scope of a major [government] program.' " Id. at 630 (citing Peters v. Delaware River Port Auth., 16 F.3d 1346, 1353 (3d Cir. 1994)). The District Court concluded that "overseeing the cars owned by the Commonwealth and used by its agencies . . . is not a major government program . .. [as it does not] involve services to the general public or to a sizable portion of the public." Id. The court thus ruled that Assaf was entitled to First Amendment protection from political discharge. Nonetheless, it held that the defendants were entitled to qualified immunity because it was not clearly established that Assaf could not be fired for political reasons. See id. at 633.

III.

Summary judgment is appropriate only if the record discloses that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The record is to be examined in a light most favorable to the non-movant, in this case, Assaf. See Peters v. Delaware River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

At the outset, we note that the only issue before us on this appeal is the propriety of the District Court's ruling that Fields and Crowell were entitled to qualified immunity. Although much of appellees' brief appears directed to the question of whether Assaf's position was "inherently political," Appellees' Br. at 25, the appellees have neither cross-appealed the ruling on that issue nor have they included this as one of their issues on appeal. Accordingly, we will focus on the District Court's determination that under clearly established law, reasonable officials would not have perceived that terminating Assaf for political reasons was unconstitutional. This necessarily requires that we review the applicable law, with particular attention to the dates the leading opinions were announced.

In Siegert v. Gilley, 500 U.S. 226, 231 (1991), the Supreme Court explained that "the proper analytical

framework" for addressing qualified immunity claims is to ascertain first whether plaintiff's claims make out a violation of a constitutional right. See also Brown v. Grabowski, 922 F.2d 1097, 1110 (3d Cir. 1990). Only if such a violation has been alleged need we proceed to determine whether, in the light of "clearly established law," the unlawfulness of the action would have been apparent to a reasonable official. See Siegert, 500 U.S. at 232 ("A necessary concomitant to the determination of whether the constitutional right asserted by the plaintiff is `clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."); County of Sacramento v. Lewis, 523 U.S. 833, ____ n.5, 118 S. Ct. 1708, 1714 n.5 (1998) ("As in any action under S 1983, the first step is to identify the exact contours of the underlying right said to have been violated.").

The Supreme Court first established the proposition that as a general matter, a public employer cannot, consistently with the First Amendment, terminate a public employee for political reasons in Elrod v. Burns, 427 U.S. 347 (1976). In writing for a three-Justice plurality, Justice Brennan reasoned that because requiring financial and campaign assistance to the favored political party "is tantamount to coerced belief " and a required pledge of allegiance "compromise[s] the individual's true beliefs," id. at 355, it follows that "the practice of patronage dismissals clearly infringes First Amendment interests," id. at 360. He also reasoned that conditioning public employment on patronage support "inhibits protected belief and association." Id. at 359 (citing, inter alia, Perry v. Sindermann, 408 U.S. 593 (1972)).

He recognized that the prohibition was not absolute, but allowed an exception only for those in "policymaking" positions "to insure that policies which the electorate has sanctioned are effectively implemented." Id. at 372. The plurality opinion states that "[i]n determining whether an employee occupies a policymaking position, consideration should . . . be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." Id. at 368. The Court concluded, however, that the

8

employees whose terminations were at issue in Elrod, (the chief deputy of the process division of a sheriff's office, a process server, a process division employee, and a bailiff and security guard at a county juvenile court) did not fall within the exception.

The concurring opinion, written by Justice Stewart on behalf of himself and one other Justice, declined to comment on the first of the plurality's two rationales (that a patronage system tended to coerce employees into compromising their true beliefs) but agreed with the second rationale, i.e. that patronage dismissals effectively imposed an unconstitutional condition on the receipt of a public benefit. The two concurring Justices also agreed that the Elrod plaintiffs did not fall within the class of employees with "policymaking" responsibilities who were exempted from First Amendment protection. See id. at 374-75.

Four years later, in Branti v. Finkel, 445 U.S. 507 (1980), a firm majority of the Court, this time speaking through Justice Stevens, reiterated that the First Amendment prohibits discharge of public employees for their party affiliation. In Branti, the Court addressed the district court's conclusion, affirmed by the court of appeals, that assistant public defenders were not the type of policymaking, confidential employees exempted from the general prohibition on politically motivated dismissals. The Court eschewed overreliance on labels such as "confidential" or "policymaking" and stated that "[i]n sum, the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 518. Applying this standard, the Court agreed that assistant public defenders did not fall within the exception to the general prohibition against politically motivated dismissals from public employment. See id. at 520.

The Branti-Elrod decisions were widely publicized, particularly among officials in positions in state and local governments who have authority to hire and fire government employees. It is reflective of this general knowledge that Fields and Crowell do not contend that they

9

were unaware of the severe limitation that was now placed on terminations because of political affiliation. All that remained after Branti-Elrod was the application of the principle to the positions of the plaintiffs who brought suit.

Illustrations were soon forthcoming from all the circuits. This court applied and elaborated on the principles enunciated in Elrod and Branti in a series of cases decided over the last eighteen years. The year after the Branti decision, we stated in Ness v. Marshall, 660 F.2d 517, 521 (3d Cir. 1981), that the Court's opinion calls for a "functional analysis," which entails an examination of whether "a difference in party affiliation[would] be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office," in which case a dismissal for political reasons "would not offend the First Amendment." We noted that the Elrod plurality suggested that "employees who act as advisers, who formulate plans for implementing broad goals, or whose responsibilities are either not well defined or of broad scope are more likely to function as policymakers." Id. at 520 (citing Elrod, 427 U.S. at 367-68). Because the duties of the plaintiffs in Ness, the city solicitor and assistant city solicitors of York, Pennsylvania, included "rendering legal opinions, drafting ordinances, [and] negotiating contracts" for the city, which we concluded were "intimately related to city policy," we held that party affiliation was an "appropriate (even if not necessary) requirement" for their effective performance. Id. at 522.

Again, in Brown v. Trench, 787 F.2d 167 (3d Cir. 1986), we held that the Assistant Director of Public Information for a Pennsylvania county could be dismissed on account of her political affiliation because her "position is one which cannot be performed effectively except by someone who shares the political beliefs of the Commissioners." Id. at 170. Although we reversed judgment for the defendants because Brown had not been given a pretermination hearing, we used that decision as a vehicle to "specif[y] the factors that indicate that a position falls within the Branti test." Id. at 169. Looking to cases decided by other courts, we identified as relevant "whether the employee's duties are simply clerical or related to law enforcement" or

10

"nondiscretionary or technical," "whether the employee participates in Council discussions or other meetings, whether the employee prepares budgets or has authority to hire or fire employees, the salary of the employee, and the employee's power to control others and to speak in the name of policymakers." Id. (citations omitted).

After reviewing these considerations, we concluded that the "key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility but whether the employee has `meaningful input into decisionmaking concerning the nature and scope of a major [government] program.' " Id. at 169-70 (quoting Nekolny v. Painter, 653 F.2d 1164 (7th Cir. 1981)). This factor was to be determinative in many of the cases we decided thereafter.

In Zold v. Township of Mantua, 935 F.2d 633 (3d Cir. 1991), we were called upon to decide whether the politically motivated discharge of a deputy municipal clerk violated the First Amendment. Synthesizing our case law on the subject, we stated that

> the ultimate inquiry . . . is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the particular office involved. . . . [S]hould a difference in party affiliation be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office, dismissals for that reason would not offend the First Amendment. The burden of proof is on the defendant to demonstrate an overriding interest in order to validate an encroachment on an employee's First Amendment rights.

Id. at 635 (quotation marks and citations omitted). In light of these principles we concluded that the deputy municipal clerk--whose duties included "acting as (1) secretary to the governing body, (2) secretary of the municipal corporation, (3) election official and (4) administrative official on the municipal level," id. at 637--was not a position for which political firing was permissible. See id. at 640.

In addition to holding the politically motivated discharges of the deputy clerk impermissible in Zold, we also found

11

impermissible the discharge of a second deputy recorder of deeds, see Furlong v. Gudknecht, 808 F.2d 233, 238 (3d Cir. 1986); a deputy sheriff, see Burns v. County of Cambria, 971 F.2d 1015, 1022 (3d Cir. 1992); and a deputy director of marketing and communications for a county aviation department, see Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 401 (3d Cir. 1998). On the other side of the line, we found that political affiliation was relevant for a director of a state agency concerned with the provision of veterans' benefits, see Waskovich v. Morgano, 2 F.3d 1292, 1303 (3d Cir. 1993), a secretary of an interstate port authority, see Peters, 16 F.3d at 1359, as well as the county assistant director of public information referred to above, see Brown, 787 F.2d at 170.

The District Court's conclusion that Assaf's position was not one for which political affiliation may be required was fully supported by the evidence submitted in connection with the summary judgment issue, as Assaf did not have significant input into a major government program within the contemplation of our case law. However, the District Court proceeded to hold that it was not clearly established that Assaf 's position was one for which political affiliation could not be required and that therefore the defendant officials were entitled to qualified immunity. It offered three rationales for this conclusion.

The first was that "except for Waskovich, the existing Third Circuit precedent provided no guidance." Assaf, 999 F. Supp. at 633. However, Waskovich itself emphasized the same factors identified in our prior cases: whether the employee had "meaningful input into decision making concerning the nature and scope of a major [government] program." Waskovich, 2 F.3d at 1297 (quoting Brown, 787 F.2d at 169-70). Instead, the District Court's analysis appears to require a closer factual correspondence between the case under examination and prior decided cases than is consistent with qualified immunity doctrine and its application by this court.

When deciding whether the law is clearly established, the Supreme Court has cautioned against looking at the constitutional issue too abstractly. Anderson v. Creighton, 483 U.S. 635, 639 (1987). Rather, the right the official is

12

alleged to have violated must have been `clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. On the other hand, "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (citation omitted).

Given the nature of the inquiry in the Branti-Elrod cases, we reject appellees' argument that qualified immunity is "well suited to cases where there is no `bright line' rule." Appellees' Br. At 12. Were we to adopt this position, we would effectively eviscerate the constitutional imperative behind Branti-Elrod jurisprudence. Under the qualified immunity regime contemplated by appellees, liability in such areas could never attach because the lack of"bright line" rules inherent in the doctrine would continually provide cover for violations of constitutional rights. In an earlier case in which we rejected the defendants' qualified immunity claim, we explained that if we were to require " `precise factual correspondence' between the case at issue and a previous case . . . we would not be `faithful to the purposes of immunity by permitting . . . officials one liability-free violation of a constitutional or statutory requirement.' " Burns, 971 F.2d at 1024 (quoting People of Three Mile Island v. Nuclear Regulatory Comm'rs, 747 F.2d 139, 144-45 (3d Cir. 1984)).

Contrary to the District Court's assertion, our cases have given guidance to government officials within our circuit. An employee may be terminated for political reasons only if "a difference in party affiliation [is] highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office," Waskovich, 2 F.3d at 1297 (internal quotation marks omited), and that only if an employee's duties make it possible to cause "serious political embarrassment," id. at 1302, will the position meet the narrow Branti-Elrod exception.

We have noted that the inquiry into the employee's duties is a "fact specific" one, id. at 1297 (quoting Zold, 935 F.2d

13

at 635), and that although we look to "the functions of the public office in question and not the actual past duties of the particular employee involved," id. (quoting Brown, 787 F.2d at 168) (alteration and internal quotation marks omitted) evidence of past job duties may be, and often is, informative, see Peters, 16 F.3d at 1353.

Officials to whom this court applied the Branti-Elrod exception before Assaf 's termination, such as the director of an interstate port authority charged with, inter alia, the responsibility for developing a master economic plan for an interstate district, in Peters, 16 F.3d at 1354-55, the director of a state veteran's services agency responsible for overseeing the delivery of benefits and services to veterans, in Waskovich, 2 F.3d at 1297, and the secretary for a county's office of public information charged with duties such as "preparing and distributing press releases, contacting media representatives, and promoting county projects," and who hence represented the county government to the public, in Brown, 787 F.2d at 168, were those with responsibility connected to major government programs. The common thread among them is that their positions related to the government's activity vis-a-vis the public. That is, these positions entail the formulation or implementation of policies that have a direct impact on the public or the representation of government policies to the public.

By contrast, Assaf was charged with the responsibility of directing--within a very narrow compass of authority--an agency overseeing the Commonwealth's motor pool. While this is, to be sure, an important function, it is not a "major government program" in the sense that phrase is used in our case law. The acquisition, maintenance, and disposition of the Commonwealth's vehicles is a largely endogenous function of the state government and as such serves an internal and practical purpose--supplying vehicles to Commonwealth agencies and executives, maintaining these vehicles, and overseeing the purchase and sale of the vehicles. There is nothing in these functions that would lead a reasonable official to conclude that the Director of the Bureau of Vehicle Management made such politically sensitive policy judgments that the Director need have a

14

common political philosophy with the incumbent political regime.

Moreover, Assaf's position did not involve significant contact with the public. He did not represent the Commonwealth or speak in its name, and was thus unlike the plaintiff in Brown who "present[ed] the views of the [County] Commissioners to the press and public on a daily basis." 787 F.2d at 170. Assaf's only interaction with the public occurred at the auction of the surplus fleet vehicles, plainly not the type of public appearance that requires the employee to hew to a particular party's line. As the District Court noted, to the extent that this function involves interaction with the public, it is "a tiny segment of the public, who appear voluntarily for what is essentially a commercial transaction--the purchase of a car." Assaf, 999 F. Supp. at 630.

It should not have been difficult to see that far from representing the government, as was the plaintiff's duty in Brown, Assaf's public contact was much more like that at issue in Zold, where we found that political allegiance was not an appropriate criterion for the decision to terminate the plaintiff. In Zold, the public contact of the plaintiff, the deputy township clerk, was more extensive than Assaf's, involving as it did "informing reporters about the agenda of upcoming meetings and . . . receiving inquiries and complaints from the electorate . . . and responding in kind." 935 F.2d at 638 (citation and internal quotation marks omitted).

We reject appellees' argument that our decision in Waskovich could have been understood by reasonable officials to render the political firing of Assaf lawful. The plaintiff in Waskovich was the former Director of the New Jersey Division of Veterans' Administrative Services, and as such was responsible for the administration of services and benefits to an estimated 900,000 veterans throughout the state. See Waskovich, 2 F.3d at 1302. Although Waskovich oversaw the day-to-day operations of veterans' facilities, he also advocated for the veterans that were in the state's care. See id. at 1300. We described his role as that of a government official who "orchestrate[s] the provision of veteran services." Id. at 1302. In holding Waskovich's

15

position exempt, we emphasized that Waskovich had significant policymaking authority with respect to this position, and that "he was involved in policy matters on a day-to-day basis, that he made recommendations on policy matters on several occasions, that his superiors asked for his views of major policy proposals such as capital improvement programs, and that he often opposed policies they espoused." Id. at 1300.

Assaf's position, on the other hand, concerns the administration of the state's fleet of vehicles. Without denigrating the importance of such a position, there is no reason to conclude that high state officials would have analogized Assaf's position to Waskovich's. In light of Assaf's lack of any significant contact with the public and the undisputed fact that Assaf's level of responsibility did not touch on politically sensitive issues, which would raise the likelihood of serious political embarrassment, no official cognizant of the existing precedents of this court could have concluded that the modest managerial responsibilities over the Commonwealth agencies' fleet of cars would constitute meaningful input into a major government program.

The second reason given by the District Court for its qualified immunity decision was that Assaf's status as "middle management" made it objectively reasonable for appellees to believe that his position was subject to patronage dismissal. Nothing in this circuit's precedents suggests that middle managers qua middle managers are more likely to fall within the exception than other types of employees. In fact, not one of our Branti-Elrod decisions even mentions the term "middle management" or"middle manager." To the contrary, as we observed in Brown, managerial or supervisory authority, by itself, does not suffice to bring a position within the Branti-Elrod exception. See Brown, 787 F.2d at 169-70. In short, to label someone a middle manager says nothing about whether or not that person has significant policy-making responsibilities that make adherence to the incumbent party's political philosophy a necessary job requirement.

In a similar vein, the District Court suggested that the division of authority between the Seventh Circuit in Selch v. Letts, 5 F.3d 1040 (7th Cir. 1993), and the Fourth Circuit

in Akers v. Caperton, 998 F.2d 220 (4th Cir. 1993),
supports the determination that it was unclear whether
Assaf's duties were such that he was subject to patronage
dismissal. These cases have little to say about the kind of
position involved here, nor do they stand for the
proposition, implicit in the District Court's analysis, that
middle managers may be subject to political firing. Selch
concerned the position of "subdistrict superintendent," a
job that involved "plan[ning the] annual workload and
determin[ing] resource requirements based upon that plan;
--investigat[ing] and tak[ing] corrective action on
complaints and information requests from the general
public; [and] --provid[ing] personal supervision, personnel,
and equipment during emergencies, such as snow and ice
removal, detours, accidents, and road repairs, etc." Id. at
1044-45. Akers involved the holder of a similar job--that of
"county maintenance superintendent." The Seventh Circuit
in Selch held that the position was one for which patronage
dismissal was constitutionally permissible; the Fourth in
Akers had held the opposite.

The Selch and Akers plaintiffs had a great deal of
responsibility to decide how the physical maintenance of
streets gets done, and, as is well known, local political
regimes can stand or fall on the incumbents' ability to fix
potholes and remove snow. In any event, those decisions
from other circuits cannot reasonably have been relied on
by officials in a state within this court's jurisdiction when
this court has numerous opinions to serve as guidance on
the subject.

The final reason offered by the District Court in support
of qualified immunity was the observation that"Assaf's
duties were not merely technical, he participated in
meetings, and he could control others." Assaf, 999 F. Supp.
at 633. This description, however, could just as well apply
to any public employee with a measure of supervisory
responsibility. Although Assaf met with the Deputy
Secretary every two weeks along with the other Bureau
Directors, occasionally met with Fields alone, and on three
occasions attended out-of-state programs held by the
National Association of Fleet Administrators that
highlighted products and involved discussions of fleet

17

management techniques, these functions say nothing significant about the extent to which his duties required that he have the same political affiliation as the incumbent regime.

In his position as Director of the Bureau of Vehicle Management for the Commonwealth, Assaf had management responsibilities in three principal areas: (1) obtaining and maintaining the Commonwealth's fleet of vehicles; (2) directing the operation of the Commonwealth Garage (i.e., supervising the maintenance of the fleet); and (3) overseeing the disposition of Commonwealth-owned vehicles at auction. These duties do not involve matters that have an impact on the public nor does the Bureau Director represent the government in its interactions with the public. It would be manifestly unreasonable for officials to believe that such an intragovernmental operation as the management of the state's fleet of vehicles involves politically sensitive matters.

Although Assaf's lack of input into a program that can be considered major is sufficient to establish that it should have been apparent to reasonable officials that his job was protected under the First Amendment, it should also have been known to his superiors that Assaf's level of responsibility within the Bureau was not very significant. In particular, the record suggests that Assaf did not enjoy the power to hire or fire employees, but only to reprimand them. He directly supervised only three employees. He oversaw the purchase of vehicles, but did not have authority to make purchasing decisions for the Commonwealth. He had no input into his budget. As Bureau Director, he managed the Commonwealth Garage, but had no authority to negotiate maintenance contracts with outside vendors. Assaf oversaw the administration of the auctions, but the selection of cars and the target prices to be achieved at auction were set by formula, not according to the Director's initiative. Although Assaf instituted a set of procedures for the conduct of the auction when he learned of dissatisfaction with the auction process, the minor nature of the changes, i.e. changing the process for counting money, installing a locking door on the auction stage, and attempting to ensure that the target prices were

18

obtained, see Assaf at 93-95, show the technical nature of his input.

Appellees make much of the fact that Assaf forwarded to Fields a suggestion for altering the formula for calculating the labor rates for maintenance contracts (a suggestion ultimately adopted by Fields), but we do not find in this event an indicium of "significant input into broad goals" sufficient to support qualified immunity. Leaving aside the fact that the suggestion was not, in the first instance, the product of any initiative on Assaf's part, the narrow ambit of the suggestion and the fact that it was up to Fields to make the ultimate decision as to whether it would be implemented further suggest that such "broad goals" as the Bureau may have had were firmly in the control of Fields, not Assaf. As the District Court aptly summed up, "the plaintiff ran the day-to-day operation of the Bureau, but Fields kept a `tight rein.' " Assaf, 999 F. Supp. at 626.

In an earlier Branti-Elrod case, we rejected the defendants' contention that the right at issue was not clearly established, stating that "we are satisfied that the decisions of this court have been sufficiently consistent to have clearly established to all state and municipal employers that firing or other adverse employment action for political reasons contravenes the Constitution unless defendants could show that the particular position came within the narrow exception." Burns, 971 F.2d at 1024. That conclusion is just as applicable here. Here, as in Burns, the defendants "should have related this established law to the instant situation." Id. at 1025, (quoting Hicks v. Feeney, 770 F.2d 375, 380 (3d Cir. 1985) (internal quotation marks omitted)).

The nature and limits of Assaf's responsibilities and authority were not unknown to defendants Fields and Crowell. After all, it was Fields to whom Assaf directly reported, and Fields in turn reported to Crowell. In fact, Crowell who, as the Secretary of General Services, was responsible for Assaf's termination, testified at his deposition that party affiliation was not an appropriate requirement for the job. See Crowell at 61. In Burns, we saw no reason why any "reasonable employer" would have thought that the employee "could be fired for political

19

reasons." Burns, 971 F.2d at 1024. Any hypothetical reasonable official should have known that the limited nature of Assaf's authority would place his position in line with those that we held were protected by the First Amendment in Zold (deputy municipal clerk who ran day-to-day functions of the clerk's office), Furlong (second deputy recorder of deeds, who satisfied mortgages, recorded documents and forwarded taxes to the relevant authorities), and Burns (deputy sheriff who was responsible for serving process, transporting prisoners, and guarding courtrooms).

Consequently, we hold that a reasonable official would not have concluded under clearly established law that political loyalty could be required for Assaf's position.

IV.

For the reasons set forth, we will reverse the decision of the District Court granting summary judgment to defendants on the ground that they have qualified immunity. As the defendants have argued that they did not dismiss Assaf for political reasons, we will remand for further proceedings.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

20