**Lynn O'SULLIVAN, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. CIV. 99–994(SSB).**

United States District Court,
D. New Jersey.

Sept. 19, 2000.

Frederick R. Grayer, Craig A. Cox, Kent Grayer & Rosenberg, P.C., Willingboro, NJ, for Plaintiff Lynn O'Sullivan.

B. John Pendleton, Jr., Kristin L. Wynne, McCarter & English, LLP, Newark, NJ, for Defendant Metropolitan Life Ins. Co.

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Presently before this Court, pursuant to the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. §§ 1132(e)(1), as well as 28 U.S.C. § 1446(a) (removal statute) and 28 U.S.C. § 1331 (federal question jurisdiction), is the Motion for Summary Judgment by Defendant Metropolitan Life Insurance Company (hereinafter "MetLife"), Plaintiff Lynne O'Sullivan's ("O'Sullivan") Opposition of Defendant's Motion for Summary Judgment and Cross Motion for Summary Judgment, Defendant's Opposition to Plaintiff's Cross Motion for Summary Judgment, Plaintiff's letter-brief in lieu of a formal reply brief, and Defendant's letter-brief in response. Both parties' letter-briefs specifically argue their positions in light of *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir.2000), decided after initial pleadings were filed. Pursuant to Fed.R.Civ.Proc. 78, these motions are decided without oral argument. For the reasons stated below, Defendant's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment will be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

O'Sullivan was employed with Medaphis Corporation ("Medaphis") as a computer

operator. (*See* Compl., dated December 15, 1998, at ¶ 2) O'Sullivan was a participant of an employee welfare benefit plan (the "plan") sponsored by Medaphis through a group policy issued by MetLife. (*See* Affidavit of Guyton Daniels at ¶ 1 & Exh. A) The benefits plan included short term disability ("STD") coverage for disability up to a period of six months, and long term disability ("LTD") coverage for disability which extended beyond the six-month period. (*See id.*)

## A. The Plan

MetLife acts as the claim fiduciary for the employee benefits plan offered to Medaphis employees. (*See* Daniels Aff. at ¶ 2) It processes all claims for payment of benefits under the plan, and makes payment of any benefits that may be due to a beneficiary in accordance with the terms of the plan. (*See* id.) MetLife is thereby both the insurance provider and plan administrator. Under the terms of the plan, it has specific discretionary authority to interpret plan terms and to determine eligibility for plan benefits. The plan provides that:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(*See* Daniels Aff. at Exh. A)

In reference to the LTD benefits policy, the Plan contains a "Pre–Existing Condition Limitation" provision, which states: "This plan does not provide benefits for any Disability that is caused by, contributed to by, or resulting from a Pre–Existing Condition, unless the Disability begins after you have been covered under This Plan for 12 months in a row." (*See* Daniels Aff. at Exh. A) A "Pre–Existing Condition" is defined in the Plan's provisions as "a Sickness or Injury for which you received medical Advice or Treatment during the 90 day period immediately prior to your effective date of Personal Benefits." (*See* Daniels Aff. at Exh. A) If a plan participant has a disability that begins within 12 months of employment and that disability is a pre-existing condition, that participant is ineligible for LTD benefits.

## B. O'Sullivan's Disability Claim and MetLife's Decision

On or about August 31, 1997, or Labor Day weekend 1997,[1] O'Sullivan claims that she suffered an injury to her thoracic spine after attempting to lift a pickup truck bed. (*See* Compl. at ¶ 2; *see also,* O'Sullivan Aff. at ¶¶ 2–3) On September 4, 1997, she visited her family doctor at Sunset Road Medical Associates ("SRMA") because her pain, resulting from the incident, had worsened. (*See* Compl. at ¶ 2, O'Sullivan Aff. at ¶ 4) Since this doctor's visit, O'Sullivan has been examined by several physicians, who have diagnosed her condition as thoracic stretch injury, intercostal neuritis which developed into reflex sympathetic dystrophy (RSD). (*See* Compl. ¶ 2) Because of this injury, O'Sullivan claims that she is disabled and unable to work. (*See* O'Sullivan Aff. at ¶¶ 6 & 10)

On September 29, 1997, O'Sullivan submitted a Statement of Claim ("claim form") seeking STD and LTD benefits under the plan policy. (*See* Daniels Aff. at ¶ 6, O'Sullivan Aff. at ¶ 14) The claim form, signed by O'Sullivan, states that her treatment for her disability began September 4, 1997, and that she was first disabled by her injury on September 11, 1997. (*See* Daniels Aff. at Exh. B, Affidavit of Kristin L. Wynne at Exh. B) The signature of Dr.

---

1. O'Sullivan and the documents regarding her claim refer to both "on or about August 31, 1997" and "Labor Day weekend 1997" as the dates of the incident which resulted in her disability. (*See* Complaint at ¶ 1, O'Sullivan Aff. at ¶ 2, Pl. Mat. Facts at ¶ 1)

Albert Talone, of SRMA, is on the "Attending Physician's Statement" portion of the claim form. Under the heading, "Diagnoses/Analysis," is written "low back pain, DJD, osteoporosis." (*See* id.)

O'Sullivan and her treating physicians submitted numerous documents to MetLife in consideration of her disability claims. (*See* Daniels Aff. at ¶ 8 & Exhs. C–E, Wynne Aff. at Exh. B) These documents include, but are not limited to, various physicians' reports, medical office notes, and x-ray reports. (*See* Wynne Aff. at Exh. B)

MetLife denied O'Sullivan's LTD claim in a letter dated October 27, 1998 from Renay Bryant, STD/LTD Case Manager.[2] (*See* O'Sullivan Aff. at 62, Wynne Aff. at B) The proffered reason for denying O'Sullivan's LTD claim was that her condition causing her to be disabled was a pre-existing condition.[3] (*See* id.)

On November 25, 1998, O'Sullivan requested an appeal of MetLife's decision denying her claim through her attorney. (*See* Wynne Aff. at Exh. B) She also submitted two additional physicians' reports along with her appeal.

On December 7, 1998, in a letter from Guyton Daniels, Unit Manager at MetLife, MetLife again denied O'Sullivan's claim. Pre-existing condition was the sole reason for the denial of O'Sullivan's LTD claim. (*See* Wynne Aff. at Exh. B) The determination that her condition was pre-existing made O'Sullivan ineligible for LTD bene-fits. Because she was ineligible, MetLife did not perform an investigation as to whether O'Sullivan would meet the definition of "disabled" under the terms of the plan.

On December 17, 1998, O'Sullivan filed a complaint against MetLife in the Superior Court, Burlington County, New Jersey for wrongfully denying LTD payments under the provisions of the employee welfare benefit plan. (*See* Compl. at ¶¶ 5–6) MetLife filed a Notice of Removal to the United States District Court, District of New Jersey. The Court construes O'Sullivan's claim as a denial of employee benefits governed by ERISA.[4]

O'Sullivan does not dispute that she was treated for back pain in November 1996, during the pre-existing period. (*See* O'Sullivan Aff. at ¶ 19) O'Sullivan contends, however, that the back pain for which she received treatment in November 1996 is a different condition from the one she now suffers. O'Sullivan claims that in 1996, she was treated for lower back pain, near the belt line, and received medication with no follow-up treatment. The present condition that O'Sullivan alleges renders her disabled is described by O'Sullivan and various physicians' reports as mid-thoracic tenderness, thoracic stretch injury, and/or mid-thoracic pain.[5] (*See* Daniels Aff. Exhs C & D, Wynne Aff. at Exh. B) O'Sullivan asserts that the current pain arises from her mid-back, left shoulder blade, and up-

---

**2.** MetLife had initially denied O'Sullivan's STD benefits by letter dated May 27, 1998. (*See* Pl. Aff. at 39) In response, O'Sullivan's attorney requested an appeal of MetLife's denial of STD benefits, as well a copy of all medical reports in possession of MetLife. (*See* Pl. Aff. at 43) O'Sullivan's STD claim was later approved by MetLife after re-review. (*See* Pl. Aff. at 58–61)

**3.** The pre-existing injury clause did not apply to STD claims. (*See* Daniels Dep. T119.23–.25)

**4.** Under ERISA, "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. . . ." 29 U.S.C. § 1132(a)(1)(B).

MetLife argues that O'Sullivan's state law claims are preempted by ERISA. (*See* Def.'s Br. at 9–16) Review of O'Sullivan's complaint reveals no assertion of state law claims. (*See* Complaint)

**5.** "Thoracic" is defined as "pertaining to or affecting the thorax (chest)," or pertaining to or affecting "the part of the body between the neck and the thoracic diaphragm, encased by the ribs; the chest." *See Dorland's Illustrated Med. Dictionary*, p. 1705 (Philadelphia: W.B. Saunders Co., 28th ed.1994)

per rib area, not the lower back area. (*See* O'Sullivan Aff. at ¶ 21)

O'Sullivan represents and MetLife does not dispute that while her claim was pending, no one at MetLife asked O'Sullivan questions regarding previous injuries, and had never requested that she provide any information regarding a possible pre-existing injury. (*See* O'Sullivan Aff. at 15 & 18) MetLife did not request that O'Sullivan undergo an independent medical exam. (*See* Daniels Dep. T96.18–.21) Nor has MetLife ever performed an internal or independent medical review of O'Sullivan's records. (*See* Daniels Dep. T96.13–.21, 97.13–.19, 103.4–.11)

## II. STANDARD FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56 provides that summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or ... vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. STANDARD OF REVIEW IN A DENIAL OF BENEFITS CLAIM

Ordinarily, a court applies a de novo standard of review to a plan administrator's denial of ERISA benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), *Abnathya v. Hoffmann–LaRoche, Inc.*, 2 F.3d 40, 44–45 (3d Cir.1993). Where the plan grants the administrator discretionary authority to construe the terms of the plan or to determine eligibility for benefits, however, the courts may reverse the denial of benefits only if the administrator's decision was "arbitrary and capricious." *See Firestone*, 489 U.S. at 115, 109 S.Ct. 948, *Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagen of America*, 222 F.3d 123, 128–29 (3d Cir.2000). The "arbitrary and capricious" standard is essentially the same as the "abuse of discretion" standard. *Abnathya*, 2 F.3d at 45, n. 4. The "arbitrary and capricious" or "abuse of discretion" standards of review apply whether the administrator's decision was based on the interpretation of the plan or on factual determinations. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 438 (3d Cir.1997).

Where an insurance company both determines eligibility for benefits and pays benefits out of its own funds, the law within this Circuit is to review the denial of benefits under "heightened" arbitrary and capricious review. *Pinto v. Reliance Std. Life Ins. Co.,* 214 F.3d 377, 378 (3d Cir.2000). Heightened arbitrary and capricious review adheres to the Supreme Court mandate that where a benefit plan grants discretion to the administrator who is operating under a conflict of interest, that conflict must be weighed as a "factor" in determining whether there is an abuse of discretion. *See Firestone* 489 U.S. at 115, 109 S.Ct. 948. Under *Pinto,* a conflict of interest is assumed where insurance companies both determine eligibility for benefits and pay out those benefits from their own funds because there exists "an active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as insurers...." 214 F.3d at 388. Such "potential self-dealing warrants that fiduciary insurer's decisions be closely inspected." *Id.* at 387–88. Applying a more highly deferential standard of review, particularly in these cases where "smoking gun" direct evidence of purposeful bias is rare, would allow benefits decisions to be virtually immunized. *See id.* at 389.

In *Pinto,* the Third Circuit explicitly adopted the "sliding scale approach" of arbitrary and capricious review, allowing "each case to be examined on its facts." *See id.* at 392. Under this approach, the degree of judicial scrutiny intensifies to match the degree of conflict. *Id.* at 379 & 392. District courts are directed to "consider the nature and degree of apparent conflicts" when determining whether a plan administrator may have abused its discretion in rendering a benefits decision. *See id.* at 393.

In *Pinto,* the defendant insurer had concluded that the plaintiff was not totally disabled by a cardiac condition and thus denied her claim for LTD benefits. The district court had granted summary judgment in favor of the insurer on the grounds that the insurer's decision was discretionary and not arbitrary and capricious. *See id.* at 382. On appeal, the Third Circuit did not dispute that under the arbitrary and capricious standard, the insurer's decision would likely pass judicial review. Rather, the Third Circuit determined that a different standard of review applied, based on the fact that the defendant insurer both determined eligibility for benefits, and paid those benefits out of its own funds.

The *Pinto* Court examined both the process by which the insurer's result was achieved as well as the insurer's decision itself in its determination of whether summary judgment was proper. In its review of the insurer's process, the Court noted several procedural anomalies. *See id.* at 393–94. First, the insurer had initially decided that the plaintiff was totally disabled, then changed this determination without receiving any additional medical information. *See id.* at 393. The only change that had occurred was that the plaintiff's Social Security Administration (SSA) application was rejected. Further, while the SSA rejection appeared to have caused the insurer to decide that the plaintiff was not totally disabled, the SSA reversal did not have the same effect of reversing the insurer's decision. Secondly, the insurer selectively credited the expertise of one physician, while rejecting other opinions. *See id.* Finally, the insurer had ignored the recommendation of its own staff worker, who suggested that Pinto's benefits be reestablished pending further testing. *See id.* at 394.

In examining the insurer's actual decision, the *Pinto* Court noted that the administrator had "some credible evidence" to make the determination that the plaintiff was not totally disabled. *Id.* at 393. "Two doctors, one of whom is a specialist in cardiology, stated that they did not believe that she was totally disabled." *See id.* The Third Circuit thus recognized that if it had applied the extremely deferential arbitrary and capricious review, it would

have likely affirmed the judgment of the district court. *Id.* Instead, the *Pinto* court continued to evaluate the record in its entirety. The plaintiff too, had some "credible evidence" of total disability, both from her long time treating cardiologist, as well as another cardiologist. *See id.* Although the evidence for the insurer and the evidence for the plaintiff was "two-to-two," as there were two doctors on either side of the "disability debate," the Court determined that because neither of the doctors retained by the insurer had the same contact with the plaintiff that her long-time physician did, and because one of the doctors on which the insurer relied was a pulmonologist, and not a cardiologist, the plaintiff had the stronger case. *See id.* at 394. Based on the evidence, the Third Circuit determined that, "a factfinder could conclude that [the insurer's] decision to credit its doctors over [the plaintiff's] was the result of self-dealing instead of the result of a trustee carefully exercising its fiduciary duties to grant [plaintiff] the benefits due her under the insurance plan." *See id.* at 394. The Third Circuit therefore overturned the district court's grant of summary judgment in favor of the defendant insurer.

## IV. APPLICATION

### A. *Evidence Available For Judicial Review*

█ When reviewing a plan fiduciary's decision under the arbitrary and capricious standard, the Court is limited to "that evidence that was before the administrator when [it] made the decision being reviewed." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 440 (3d Cir.1997) (citations omitted); *see also Stout v. Bethlehem Steel Corp.* 957 F.Supp. 673, 691 (E.D.Pa.1997); *Teeter v. Supplemental Pension Plan of Consolidated Rail Corp.,* 705 F.Supp. 1089, 1095 (E.D.Pa.1989).[6] O'Sullivan has argued in her brief that the Court should review evidence beyond the administrative

record in its review of MetLife's decision, and points to several cases where courts have looked to additional evidence in reviewing a plan administrator's decision. (*See* Pl. Br. in Opp. at 14–18)

█ The cases upon which O'Sullivan relies, however, involve *de novo* review of ERISA claims. *See e.g., DeFelice v. American Int'l Life,* 112 F.3d 61 (2d Cir. 1997), *Jones v. United States Life Ins. Co,* 12 F.Supp.2d 383 (D.N.J.1998), *Warshaw v. Continental Casualty Co.,* 972 F.Supp. 428 (N.D.Ohio 1997). As discussed above, MetLife's discretionary authority to construe the terms of the plan and determine eligibility require that the Court apply the arbitrary and capricious standard of review, albeit a heightened one. The Court and the parties have found no applicable authority that would support looking beyond the administrative record when deferentially reviewing a plan administrator's factual determination that a claimant is ineligible for benefits. The purpose in limiting the evidentiary scope of judicial review is to encourage the parties to resolve their disputes at the administrator's level. *See Vega v. National Life Ins. Servs., Inc.,* 188 F.3d 287, 300 (5th Cir.1999). If district courts permitted claimants to present additional evidence in reviewing benefits determinations, "the administrator's review of claims [would] be circumvented." *Id.* ERISA's goal of providing plan participants and beneficiaries an expeditious and inexpensive method of resolving their disputes would be seriously impaired. *See Perry v. Simplicity Eng'g.,* 900 F.2d 963, 967 (6th Cir.1990).

█ While plan administrators could potentially manipulate the process of judicial review by excluding from its record evidence harmful to their positions, certain safeguards do exist to achieve both fairness and efficiency. A claimant can gain access to the materials in the plan adminis-

---

**6.** *Pinto* did not address whether the evidence available for judicial review changes when the standard is heightened arbitrary and capricious review, rather than the more deferential

arbitrary and capricious standard of review. For the reasons discussed below, the Court finds no reason to broaden the scope of the reviewable record here.

trator's claim file, and simply supplement the file with additional evidence that weighs in the claimant's favor. If a claimant submits additional evidence and requests the plan administrator to reconsider the previous decision, that additional evidence would be included as part of the administrative record. *See Mitchell,* 113 F.3d at 440, *Vega,* 188 F.3d at 300. Limiting the review of evidence to that which was before the plan administrator at the time of its decision is thus not overly burdensome to claimants, minus exceptional circumstances.

■ Exceptions to this general rule are appropriate where the evidence outside the administrative record is related to interpreting the plan or explaining medical terms and procedures relating to the claim. *See Vega,* 188 F.3d at 299. For instance, "evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice relating to a claim would be admissible," as such information would not be beyond the scope of evidence before the administrator at the time of its decision. *Id.* The Court is only precluded from receiving evidence to resolve disputed material facts, for instance, "a fact the administrator relied on to resolve the merits of the claim itself." *Id.*

In this case, MetLife notified O'Sullivan by a letter dated December 7, 1998, that it was continuing to deny her claim for LTD benefits upon appeal. The Court may therefore only review the evidence before MetLife at the time of its final denial of O'Sullivan's claim on December 7, 1998 in determining whether MetLife acted arbitrarily and capriciously under the heightened standard of review.

### 1. *Dr. Gerald Hayken's November 20, 1997 Report*

The Court may not consider the report by Dr. Gerald Hayken, dated November 20, 1997, in this disposition, as Dr. Hayken's November report was not before Met-Life at the time it rendered its decision denying O'Sullivan's LTD claim.

O'Sullivan had the opportunity to admit this report to MetLife. On June 4, 1998, following the initial denial of O'Sullivan's STD claim, O'Sullivan's attorney requested a copy of all medical reports in the possession of MetLife regarding O'Sullivan's benefits claim. (*See* Wynne Aff. at Exh. B) MetLife obliged. On June 30, 1998, O'Sullivan's attorney forwarded a January 15, 1998 report of Dr. Hayken, as well as a June 23, 1998 report of Dr. Post to supplement MetLife's claim file regarding O'Sullivan. O'Sullivan could have submitted Dr. Hayken's November 1997 report as well, but did not. Based on these circumstances, the Court will not consider the report or its contents in its review of Met-Life's decision to deny LTD benefits.

### 2. *Dr. Andrew Blank's Deposition Testimony*

MetLife argues that the entire testimony of Dr. Andrew Blank is inadmissible and may not be considered by the Court in reviewing MetLife's decision because his testimony was not before MetLife at the time of its review of O'Sullivan's claim. (*See* Def. Opp. Br. at 17) The Court disagrees.

Portions of Dr. Blank's deposition testimony were certainly within the knowledge of MetLife during its review of O'Sullivan's claim. For example, testimony that Met-Life did not contact Dr. Blank regarding his contradicting reports, testimony translating medical notes in the claim file, or testimony explaining medical terms used in documents within the file, would aid the Court in interpreting the documents before MetLife at the time of its decision, and may be considered by the Court.

Other portions of Dr. Blank's testimony extend beyond the scope of the administrative record and may not be considered by the Court. Such testimony involving medical opinions not within the claim file, Dr. Blank's opinion as to whether O'Sullivan's condition was pre-existing in 1996, or explanations by Dr. Blank supplementing his earlier reports may not be considered by

this Court in its review of MetLife's decision.

### B. *Review of MetLife's Decision Denying LTD Benefits*

MetLife's sole reason for denying O'Sullivan's claim for LTD benefits was that her condition was pre-existing. The Court will review the evidence before MetLife to determine if there is a genuine issue of fact as to whether MetLife was arbitrary and capricious under the heightened standard of review.

#### 1. *The Evidence Before MetLife*

##### a. *Dr. Blank's Two Reports*

In the October 27, 1998 denial letter from Renay Bryant, MetLife stated that it had relied on Dr. Blank's August 6, 1998 report in determining that O'Sullivan's condition was the same as her injury treated in November 1996. Relevant portions of the letter state:

A letter dated August 6, 1998 ... from Dr. Andrew J. Blank revealed that you were first treated for the condition of exacerbation of severe mid-back pain that began November 1996. It further states that you have been seen multiple and numerous times since 1996 with continued left thoracic tenderness.... Per our conversation with Dr. Blank's office on October 27, 1998, your initial office visit for the condition of severe mid-back pain was November 11, 1996. This is the same condition causing you to be out of work on September 12, 1997.

(*See* Wynne Aff. at Exh. B, Pl. Aff. at 62) The denial letter refers to no other evidence upon which it relied for its finding of pre-existing condition.

Indeed, Dr. Blank's August 1998 letter supports MetLife's determination that O'Sullivan's condition was pre-existing. Dr. Blank writes that he had been seeing O'Sullivan "on a fairly frequent basis for

exacerbation of severe mid-back pain" and that this pain "began approximately [November 1996] for the first time." (*See* Daniels Aff. Exh D, Pl. Aff. at 54) This document clearly provided MetLife a basis for believing that O'Sullivan's alleged disability was a pre-existing condition, previously treated in 1996.

Dr. Blank's November 1998 letter, however, completely refutes his August 1998 statements regarding onset of injury. This November 1998 report states that O'Sullivan has had "excruciating mid-thoracic pain" since Labor Day, 1997, not November 1996:

"[Ms. O'Sullivan] had been treated by our practice in numerous times in the past few years before 1997, but never for the extent of this injury specific to this area. I feel that her most recent injury of 1997, which lead [sic] to the diagnosis of RSD [reflex sympathetic dystrophy [7]], is specific to this thoracic area and is a direct consequence of her injury from 1997."

(*See* Wynne Aff. Exh. B)

O'Sullivan submitted Dr. Blank's November 1998 letter with her appeal letter along with another physician's report by a Dr. Luis Cervantes. MetLife's response to O'Sullivan's appeal revealed that it gave no credence to Dr. Blank's November 1998 letter. A December 1998 denial letter from Guyton Daniels, Unit Manager at MetLife, stated, "It appears from [Dr. Blank's November 1998 and Dr. Cervantes' reports] that the Thoracic back that [O'Sullivan] has been treated for since November 11, 1996 has finally been diagnosed as Reflex Sympathetic Dystrophy (rsd)." (*See* Wynne Aff. at B)

MetLife states that it did not act unreasonably by giving greater weight to Dr. Blank's earlier statement over his subsequent explanation and cites to *Marsteller*

---

**7.** "Reflex Sympathetic Dystrophy" is described as "a series of changes caused by the sympathetic nervous system, marked by pallor or rubor, pain, sweating, edema, or osteoporosis, following muscle sprain, bone fracture, or injury to nerves or blood vessels." *See Dorland's Illustrated Medical Dictionary*, pp. 520–21 (Philadelphia: W.B. Saunders Co., 28th ed.1994).

*v. Life Ins. Co. of N. America,* 24 F.Supp.2d 593, 596–97 (W.D.Va.1998) as support for this proposition. (*See* Def. Opp. Br. at 19)

The dispute in *Marsteller* was whether the claimant's date of disability was March 3, 1994, which would entitle him to benefits, or March 25th, in which case he would not be so entitled. One of the plaintiff's treating psychiatrists, Dr. Nelson, had written in her treatment notes that the plaintiff could work during the time period of March 3, 1994 to early April 1994. *Id.* at 598. According to the notes, Dr. Nelson believed that working would help the plaintiff with his condition. *Id.* at 598. After the plaintiff's benefits were denied, Dr. Nelson supplemented her treatment notes with an affidavit stating that the plaintiff did have the same condition on March 3, 1994 as he did on March 24.

The defendant insurer in *Marsteller* credited Dr. Nelson's earlier treatment notes, but not the statements in her affidavit, and thus denied the plaintiff's claim. The district court affirmed the administrator's decision, stating that "[t]he fact that the Plan administrator gave greater weight to the plain meaning of [one of plaintiff's treating psychiatrist's] notes than her subsequent explanations made long after the relevant treatment and in an effort to help her patient obtain benefits does not lead this court to overrule that determination under a deferential standard of review." 24 F.Supp.2d at 596.

The evidence involved in *Marsteller,* however, was substantially more favorable to the defendant insurer than is the evidence upon which MetLife claims to rely here. Two other physicians, one who was also a treating psychiatrist of the plaintiff, and another who was a medical consultant commissioned by the insurer, agreed with the conclusions of Dr. Nelson's treatment notes regarding the time of disability. *See id.* at 596–98. Based on that evidence, the *Marsteller* court determined that it was "not unreasonable for Plan administrators to accept the opinion of one treating physician and consultant Dr. Peck" and discount

the findings in Dr. Nelson's affidavit. *See id.* at 598.

Here, the statements in Dr. Blank's November 1998 report were not substantiated by any other conclusive evidence. No other physicians' report offered a 1996 date as the onset of O'Sullivan's condition. MetLife brought forward no medical expert or physician supporting the pre-existing injury determination. Finally, MetLife contends that it gave greater weight to Dr. Blank's opinion because he was O'Sullivan's treating physician and had examined her prior to her alleged 1997 disability-sustaining incident. (*See* Def. Opp. Br. at 8) It is quite suspect then, that MetLife did not even attempt to clarify the position of the doctor, upon whose opinion it claims to most rely. MetLife's willingness to accept the August 1998 statements over the November 1998 statements without further inquiry appears more self-serving than reasonable.

In its briefs, MetLife contends that it did not merely rely on Dr. Blank's August 1998 letter when it denied plaintiff's LTD claim. "Ms. Daniels found other evidence that plaintiff's alleged disability was pre-existing in a number of documents." (*See* Def. Br. in Opp. at 8) In its brief, MetLife refers to "Dr. Blank's office notes from November 1996," O'Sullivan's "initial claim form," and an "x-ray report dated September 26, 1997," as other evidence on which MetLife relied in its determination that O'Sullivan's condition was pre-existing. *See id.* The Court will now turn to discuss these documents.

b. *November 1996 Medical Notes*

MetLife's December 1998 denial letter refers to "medical records" received from Dr. Blank's office, which "indicated that [O'Sullivan] was treated for Thoracic back pain November 11th and 15th of 1996." *Id.* The Court interprets the records referred to in this letter as copies of office notes dated November 11, 1996 and November 15, 1996, detailing visits O'Sullivan made to a physician at SRMA.

The medical notes, however, do not "indicate[ ] that O'Sullivan was treated for Thoracic back pain" as Ms. Daniels states in the denial letter. There is no mention of "thoracic back" in the notes at all. The notes' legible portions refer to "severe back pain" and "L3–L5." (*See* Wynne Aff. at Exh. B) The "L" designation most likely refers to the *lumbar vertebra.*[8] *Lumbar* refers to the area "between the thorax and the pelvis," or, what a layperson might call the lower back region. *See Dorland's Illustrated Med. Dictionary,* p. 961 (Philadelphia: W.B. Saunders Co., 28th ed.1994). Instead of supporting MetLife's position in the December 1998 denial letter, the 1996 November 11th and 15th medical notes appear to support O'Sullivan's contention that her November 1996 condition involved low back pain, in a different area of the back than the alleged thoracic pain causing her to be disabled beginning Labor Day weekend 1997.

Certainly, the medical notes provide an indication to MetLife that O'Sullivan has a history of back pain. Assuming that the post-August 1997 physicians' reports are correct, and O'Sullivan's condition involves thoracic back pain, the question remains whether the November 1996 notes refer to treatment for the same condition as that which O'Sullivan currently suffers.

#### c. *Claim Form*

Though not mentioned by MetLife in either of its letters denying O'Sullivan's LTD claim, in its briefs to the Court, MetLife points to selective portions of O'Sullivan's claim form to support its determination. (*See* Def. Opp. Br. at 19) On the form, O'Sullivan's condition is described as "low back pain." Since O'Sullivan had undisputedly received treatment for low back pain in November 1996, MetLife contends that her current pain must be the same "low back pain" for which she was treated in 1996. However, all of the post-August 1997 physicians' reports describing O'Sullivan's current condition

state that O'Sullivan is experiencing thoracic or mid-back pain. No post–1997 document characterizes her condition as low back pain.

Other portions of the claim form support O'Sullivan's proposition that her condition was not pre-existing. The claim form states that the first date of treatment for O'Sullivan's injury was September 4, 1997 and the first date of disability was September 11, 1997. MetLife's decision to credit one phrase in the claim form, while rejecting other portions of the claim form that would undermine its determination, supports the inference that MetLife may have had more than its fiduciary obligations in mind when it rejected O'Sullivan's claim.

#### d. *September 26, 1997 X–Ray Report*

Although MetLife did not mention an x-ray report in either of its denial letters to O'Sullivan, it asserts in its briefs to the Court that an x-ray report, dated September 26, 1997, supports the determination that O'Sullivan's condition was pre-existing. (*See* Def. Opp. Br. at 20) While the x-ray report indicates "demineralization and scoliosis of the thoracolumbar spine," MetLife has offered no information as to how this report supports the conclusion of pre-existing injury, or bears on O'Sullivan's claim at all. The Court will not simply accept a blanket statement that the September 26, 1997 x-ray report indicates pre-existing condition without any explanation or medical information as to how. (*See* id.)

#### e. *Other Physicians' Reports*

MetLife had in its possession several reports from O'Sullivan's treating physicians giving the date of injury as August 31, 1997 or Labor Day weekend 1997. Two reports by Dr. Post, one report by Dr. Cervantes, and Dr. Blank's November 1998 report refer to an injury in the "thoracic" or "mid-back" area with an onset of injury in 1997.

---

**8.** According to the *Dorland's Illustrated Med. Dictionary,* "L" is a "symbol for *lambert, left, liter, lung, light chain,* and *lumbar vertebra*

(L1 through L5)." *See* p. 891 (Philadelphia: W.B. Saunders Co., 28th ed.1994).

Two reports from Dr. Elisabeth Post, a neurosurgeon who had evaluated O'Sullivan upon referral by Dr. Blank, support O'Sullivan's contention that her injury is in her thoracic area, and arose from a Labor Day weekend 1997 incident. A report, dated April 16, 1998, states that O'Sullivan "dates her difficulties to August 1997, when she was helping her husband lift something out of his pick-up truck and felt something snap in her back." (*See* Wynne Aff. at Exh. B) A report, dated June 23, 1998, states that O'Sullivan "complained of terrible pain to the left of her mid scapular area. She dated this pain to August of 1997, when she was helping her husband lift something out of his pick-up truck. . . ."

MetLife also had the October 14, 1998 report of Dr. Cervantes, a neurosurgeon who evaluated O'Sullivan upon referral. The report states that "Mrs. O'Sullivan was in my office to be evaluated because of thoracic pain. . . . Last Memorial Day, [Mrs. O'Sullivan] was helping her husband move a liner from a pick up truck and she felt something break in her interscapular area on the left side. . . ." Since this is the only report in the claim file that refers to "Memorial Day" as the day of injury, it is likely that Dr. Cervantes confused the holidays. Even if he did not, an injury occurring Memorial Day 1997 would not fall within the pre-existing condition exclusion under the terms of the plan.

MetLife states that it gave these physicians' reports less weight because these physicians had not treated O'Sullivan prior to 1997. In fact, MetLife claims these reports are "irrelevant regarding the determination as to whether plaintiff's disability was 'caused by, contributed to by, or resulted from a prior condition.'" (*See* Def. Br. at 21) MetLife offers no explanation or expertise dictating the conclusion that these physicians are unable to provide medical causation information, or an estimation as to length of injury. Indeed, there is no evidence that MetLife even questioned these physicians regarding the length of O'Sullivan's injury or the possibility that her condition was pre-existing.

### 2. *No Medical Review by MetLife*

MetLife did not seek the opinions of internal or independent medical experts in reviewing O'Sullivan's claim. MetLife's decision to refrain from seeking any medical review—in light of Dr. Blank's conflicting statements, no other physician providing an injury date prior to 1997, and ambiguous documents—is baffling. When asked by O'Sullivan's counsel, "[i]n Ms. O'Sullivan's case, there was never an investigation with regard to her long-term disability claim as to what her present disability was?" Ms. Daniels responded: "That question bothers me. I guess it bothers me because there has to be some knowledge of medical [sic] in order to determine a preexisting condition. So there was no knowledge of the medical [sic]." (*See* Daniels Dep. T36.8–.21) The Court too, is unclear how one determines pre-existing condition without medical expertise.

Ms. Daniels is the same person who concluded in the December 7, 1998 denial letter that: "It appears from [Dr. Cervantes' October 1998 report and Dr. Blank's November 1998 report] that the Thoracic back pain that [O'Sullivan] has been treated for since November 11, 1996 has finally been diagnosed as Reflex Sympathetic Dystrophy (rsd)." This conclusion was made wholly without any support in either of those reports. Rather, Dr. Cervantes' report gives a 1997 date of injury, and Dr. Blank's report explicitly states that her current condition is a direct result of the 1997 incident. It is unclear how Ms. Daniels was able to make this medical determination without having any training in medical diagnoses, particularly where the documents before her suggested otherwise.

### 3. *Procedural Anomalies*

Finally, there remains a question as to whether MetLife adhered to its own internal procedures when it re-reviewed O'Sullivan's claim. Procedural anomalies can be considered by the Court in determining

whether MetLife abused its discretion when it denied O'Sullivan's claim. *See Pinto,* 214 F.3d at 393–94. In Ms. Daniels deposition, she testified that upon appeal of a claim, if Ms. Daniels believes that the claim should continue to be denied, she would hand the appeal off to Ms. Sanzari, the ERISA procedural analyst, for re-review. (*See* Daniels Dep. T16.16–16.24) In O'Sullivan's case, Ms. Sanzari never re-reviewed O'Sullivan's claim after Ms. Daniels decided to deny the claim upon appeal. MetLife claims in its brief, however, that review by Ms. Daniels without a re-review by Ms. Sanzari is allowable under MetLife's procedure. (*See* Def. Opp. Br. at 20)

Whether MetLife failed to follow its own internal procedures is not dispositive as to whether MetLife's decision was arbitrary and capricious. A failure by MetLife to follow its own procedure would, however, serve as strong evidence in favor of showing an abuse of discretion. Based on the evidence currently before the Court, that determination is properly left for the finder of fact.

### 4. *A Reasonable Factfinder Could Conclude That MetLife's Decision Was Arbitrary and Capricious*

Upon the Court's review of the documents within the claim file, the evidence in support of MetLife's decision that O'Sullivan's allegedly disabling condition was pre-existing consisted of the later-retracted statements of Dr. Blank, the November 1996 medical notes indicating "severe back pain," and one phrase in the claim form indicating "low back pain" as the cause of O'Sullivan's current disability. MetLife also had in its possession several reports that indicated the onset of O'Sullivan's injury as August 31, 1997 or Labor Day weekend 1997. While it is true that *Pinto* does not require an "additional duty to conduct a good faith, reasonable investigation," 214 F.3d at 394 n. 8, in this instance, where the record contains only ambiguous and inconclusive evidence, MetLife may have acted unreasonably by not seeking additional information or clarifying the record. It appears, as was the case in *Pinto,* that "whenever [the insurer] was at a crossroads, [it] chose the decision disfavorable to [the Plaintiff]. The default position was that benefits were not granted." *See Pinto,* 214 F.3d at 394.

■ Ample evidence supports the possibility that MetLife suffered from the similar "selfserving" use of evidence that the defendant insurer suffered in *Pinto.* A reasonable factfinder could conclude that MetLife's decision to credit certain statements and documents while discounting others without a more thorough review was a result of self-dealing rather than the result of a trustee carefully exercising its fiduciary obligations. Summary Judgment is therefore inappropriate, as there exists a genuine issue of material fact as to whether MetLife acted arbitrarily and capriciously under the heightened standard of review when it rendered O'Sullivan's condition pre-existing. For these reasons, both MetLife's Motion for Summary Judgment and O'Sullivan's Cross Motion for Summary Judgment will be denied. The Court need not address the other issues in the parties' briefs at this time.

## V. CONCLUSION

For the reasons stated above, both Defendant's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment will be denied. The Court will enter an appropriate order.